**Police Benevolent Assn. of the City of N.Y., Inc. v New York City Civilian Complaint Review Bd.**

2024 NY Slip Op 30003(U)

January 2, 2024

Supreme Court, New York County

Docket Number: Index No. 150441/2023

Judge: Arlene P. Bluth

Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service.

This opinion is uncorrected and not selected for official publication.

# SUPREME COURT OF THE STATE OF NEW YORK
# NEW YORK COUNTY

PRESENT:   **HON. ARLENE P. BLUTH**                    PART            **14**

*Justice*

-------------------------------------------------------------------------------X

POLICE BENEVOLENT ASSOCIATION OF THE
CITY OF NEW YORK, INC., PATRICK J. LYNCH, as
President of the Police Benevolent Association of the
City of New York, Inc., SERGEANTS BENEVOLENT
ASSOCIATION OF THE CITY OF NEW YORK, and
VINCENT J. VALLELONG, as President of the
Sergeants Benevolent Association of the City of New
York,

Petitioner,

- v -

NEW YORK CITY CIVILIAN COMPLAINT
REVIEW BOARD and ARVA RICE, in her official
capacity as Chair of the New York City Civilian
Complaint Review Board,

Respondent.

-------------------------------------------------------------------------------X

| | |
|---|---|
| **INDEX NO.** | 150441/2023 |
| **MOTION DATE** | 12/13/2023 |
| **MOTION SEQ. NO.** | 001 002 |

**DECISION + ORDER ON MOTION**

The following e-filed documents, listed by NYSCEF document number (Motion 001) 21, 25, 26, 27, 28, 29, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 65, 66, 67, 68

were read on this motion to/for                              ARTICLE 78                              .

The following e-filed documents, listed by NYSCEF document number (Motion 002) 62, 63, 64

were read on this motion to/for                              LEAVE TO FILE                              .

Motion Sequence Numbers 001 and 002 are consolidated for disposition.   The petition

and respondent's cross-motion (MS001) to dismiss the petition are decided as described below.

The motion (MS002) by non-party the New York Civil Liberties Union ("NYCLU") for leave to

appear as amicus curiae is granted without opposition and the Court considers the amicus brief

uploaded as NYSCEF Doc. No. 64.

150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL        Page 1 of 19
vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL
Motion No.  001 002

1 of 19

**Background**

The instant hybrid proceeding concerns recent rulemaking by respondent, the New York City Civilian Complaint Review Board ("CCRB"). The CCRB is police oversight board regulated under the New York City Charter. According to the charter, this board is tasked with investigating "complaints concerning misconduct by officers of the department towards members of the public" (NY City Charter § 440[a]). CCRB is comprised of 15 members of the public (NY City Charter § 440[b][1]).

The powers of the CCRB include the "the power to receive, investigate, hear, make findings and recommend action upon complaints by members of the public or complaints initiated by the board against members of the police department that allege misconduct involving excessive use of force, abuse of authority including bias-based policing and racial profiling, discourtesy, or use of offensive language, including, but not limited to, slurs relating to race, ethnicity, religion, gender, sexual orientation and disability. The board shall also have the power to investigate, hear, make findings and recommend action regarding the truthfulness of any material official statement made by a member of the police department who is the subject of a complaint received or initiated by the board, if such statement was made during the course of and in relation to the board's resolution of such complaint" (NY City Charter § 440[c][1]). CCRB makes recommendations (NY City Charter § 440[c][1]-[2]) after which the police commissioner is entitled to impose discipline or penalties (NY City Charter § 440[d][3]). However, the police commissioner is not required to adopt the recommendations of CCRB (*id.*).

The charter also provides that the CCRB "shall promulgate rules of procedure in accordance with the city administrative procedure act, including rules that prescribe the manner in which investigations are to be conducted and recommendations made and the manner by

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**                          **Page 2 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

2 of 19

[* 2]

which, when a member of the public is the complainant, such member of the public is to be informed of the status of his or her complaint" (NY City Charter § 440[c][2]).

Petitioners bring this proceeding to challenge recent rules adopted by CCRB. They complain about a rule change regarding the use of body cameras as well as other rule changes, including disposition categories and new definitions. Each of these objections will be considered in turn below.

As part of this proceeding, the Court observes that the NYCLU filed a motion to include an amicus brief. That brief suggests that the CCRB's rules relating to the use of body cameras helps increase transparency. NYCLU persuasively argues that the CCRB is in an ideal position to promote transparency and public understanding of the use of body cameras and potential misuse by NYPD officers.

**Discussion**

When considering a challenge to CCRB's rules, challengers have a "heavy burden of showing the revised rules to be so lacking in reason that they were essentially arbitrary" (*Lynch v New York City Civilian Complaint Review Bd.*, 206 AD3d 558, 560 [1st Dept 2022], *lv to appeal denied*, 39 NY3d 902 [2022] [internal quotations and citations omitted]). CCRB can justify a rule "by stating the purpose of the rules, and by providing a clear explanation of those rules and the requirements they would impose" (*id*.). CCRB need not "fully explain its rationale for adopting a rule, nor is there any requirement that the agency articulate its rationale at the time of promulgation as long as the record reveals that the rule had a rational basis" (*id*.).

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**          **Page 3 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

3 of 19

**Body Cameras**

Before exploring the rule change with respect to body cameras, a brief background on the use of body cameras is instructive. Body cameras in New York City arose out of a federal court case concerning the NYPD's use of stop and frisk in which the presiding judge ordered a pilot program for body cameras (*Floyd v City of New York*, 959 FSupp2d 540 [SD NY 2013]). The judge in that case observed "that evaluating a stop in hindsight is an imperfect procedure. Because there is no contemporaneous recording of the stop (such as could be achieved through the use of a body-worn camera), I am relegated to finding facts based on the often conflicting testimony of eyewitnesses. This task is not easy, as every witness has an interest in the outcome of the case, which may consciously or unconsciously affect the veracity of his or her testimony" (*id*. at 562).

A broader rollout of body cameras followed in 2017 and now the program is the largest in the nation with over 24,000 officers equipped with cameras, according to the NYPD's body camera policy (*see* NYSCEF Doc. No. 13). NYPD's policy observes that body cameras "are used to contemporaneously create an objective recording of a variety of encounters between the police and the public" (*id*. at 3).

As part of the rule changes challenged in this proceeding, CCRB added the "improper use of body worn cameras" to the definition of abuse of authority. The notice of this proposed rule observed that "CCRB maintains that the improper use of [body cameras] is an abuse of police power that may reasonably result in civilian complaints, clearly implicating the CCRB's abuse of authority jurisdiction. When an officer fails to turn it on, turns it off prematurely, or fails to record an incident in violation of the NYPD Patrol Guide, these actions may result in the CCRB

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**               **Page 4 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

4 of 19

not having the evidence necessary to thoroughly investigate a complaint and reach a conclusion on the merits" (NYSCEF Doc. No. 39 at 4).

CCRB also included memo in support of the inclusion of body cameras in this definition that cited to a 2020 report it conducted about body cameras (NYSCEF Doc. No. 40). It stressed that the use of body cameras helped CCRB reach a disposition of "substantiated, unfounded or exonerated" in a greater number of cases (*id*. at 2). In other words, the body camera footage helped CCRB "determine what happen[s] during a police-civilian interaction" (*id*.).

This memo also observed that there were many instances in which police officers did not use the body cameras correctly, including turning it on too late, turning it off prematurely or failing to turn it on at all (*id*.). According to CCRB, "53% of all Other Possible Misconduct allegations referred to the NYPD by the CCRB involved improper use of [body cameras]" (*id*.). CCRB's memo asserted that "The improper use of [body cameras] is a clear abuse of authority that directly impacts the civilians involved in the interaction and implicates the CCRB's jurisdiction. These actions may result in the CCRB not having the evidence necessary to thoroughly investigate a complaint and reach a conclusion on the merits" (*id*.).

Petitioners insist that the CCRB impermissibly included body camera noncompliance in the definition of abuse of authority. They contend that this constitutes a unilateral enlargement of CCRB's jurisdiction and the inclusion of body cameras contravenes years of past practice and interpretation. Petitioners point to the NYPD Patrol Guide, which subjects an officer to numerous requirements relating to when a body camera must be activated or deactivated. They emphasize that much depends on the unique facts and circumstances of each interaction and note that sometimes cameras must be deactivated to protect the privacy of members of the public.

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**          **Page 5 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

5 of 19

Petitioners argue that noncompliance with body camera requirements falls within the jurisdiction of NYPD command level and the Internal Affairs Bureau. They insist that the plain language meaning of the phrase "abuse of authority" does not encompass the failure to properly use body cameras. Petitioners maintain that errors relating to body cameras are an entirely procedural matter as their use derives entirely from internal procedures from the NYPD. They contend that many errors related to body cameras involve unintentional mishaps, such as where a camera becomes dislodged during an encounter.

Petitioners characterize the rule as simplistic and an attempt to improperly include a broad array of acts relating to body camera errors. They argue that permitting CCRB to include body cameras within its jurisdiction is tantamount to giving CCRB unlimited jurisdiction and contravenes legislative intent. Petitioners contend that CCRB was created to facilitate the investigation of civilian complaints and that body cameras (and their misuse) are not a traditional basis for a civilian complaint. They urge the Court to view body camera issues with other recordkeeping matters, which fall outside CCRB's purview.

Petitioners add that CCRB failed to identify a rational reason for including body camera misuse in its abuse of authority definition. They insist that CCRB's criticism of the disciplinary statistics relating to body camera misuse is misleading and based entirely on speculation as CCRB cannot know how it would view these issues.

CCRB argues that its jurisdiction was left broad by the New York City Council. It points out that the text of the charter gives it authority to receive and investigate complaints involving police abuse of authority. CCRB insists that the NYPD's stated purpose for body cameras is to serve the interest of both the public and NYPD officers. It observes that camera footage can provide an objective account of an interaction between an officer and a civilian.

150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL          Page 6 of 19
vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL
Motion No.  001 002

6 of 19

[* 6]

The Court finds that the addition of the phrase "improper use of body worn cameras" to its definition of abuse of authority was rational. As noted above, the standard for this Court is to examine whether this rule is "so lacking in reason" that it is essentially arbitrary. The record here cites multiple bases for including body cameras within its jurisdiction. Most critically, CCRB conducted its own investigation into the use of body cameras and concluded that "officers often turned their BWCs on too late, turned them off prematurely, or failed to turn the BWC on at all" which violated the NYPD's patrol guide (NYSCEF Doc. No. 40).

And it asserted that in 2020 and 2021, "CCRB referred 444 instances where there was evidence that an officer improperly used their BWC" and, according to the CCRB "the vast majority of cases have resulted in instructions or formalized training—the least severe forms of discipline available" (*id*. at 3). That is, CCRB believes that most officers did not face appropriate discipline despite violating the NYPD's rules concerning the use of body cameras.

The detailed study by CCRB concerning body cameras demonstrates a valid basis to include body cameras as part of CCRB's jurisdiction (NYSCEF Doc. No. 38). The report observed that between May 2017 and June 2019, CCRB was able to close 76% of complaints on the merits where body camera footage was available as opposed to only 39% when no video was available (*id*. at 6).

It is self-evident that the improper use of body cameras (defined as turning them off too early, starting the videos too late or not using them at all in situations when they should be used) poses a significant risk of eviscerating the entire purpose of the body camera program. The proper use of a body camera can ensure that CCRB is able to reach accurate conclusions concerning civilian encounters with police. But reaching such an accurate conclusion requires that the body camera is turned on, and kept on, during an interaction in accordance with the

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL          Page 7 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

7 of 19

patrol guide. An incomplete video may only capture a portion of an interaction and thereby yield an inaccurate or misleading account.

Put another way, body cameras help to avoid, although not eliminate, a "he said, she said" situation in which CCRB is reliant upon eyewitness testimony rather than an objective video. As CCRB noted in its memorandum concerning body cameras, its report "identified instances where officers took actions to prevent or halt the recording of police misconduct, yet the discipline imposed by the NYPD thus far does not reflect that officers are being disciplined under the intentional/reckless category in the discipline matrix. Given that nonexistent or incomplete footage can have a significant impact on the CCRB's ability to evaluate officer conduct on the merits, and consequently result in officers not being held accountable for their actions, it is important that violations of BWC guidelines are appropriately disciplined" (NYSCEF Doc. No. 40 at 4). This is an entirely rational reason to exercise jurisdiction over the improper use of body cameras.

The Court recognizes that petitioners insist that the NYPD already has guidelines concerning body cameras and that it is capable of imposing discipline within the NYPD. But nothing in the NY City Charter constrains CCRB's exercise of jurisdiction over body cameras; in fact, the NY City Charter provides broad discretion to CCRB to investigate and this Court must defer to CCRB's rational interpretation of abuse of authority (*Lynch*, 206 AD3d at 560). Because of the ubiquitous nature of body cameras (NYPD's policy notes that over 24,000 officers are equipped with cameras), it is highly likely that issues involving the improper use of body cameras will inevitably arise as part of complaints before CCRB. It only makes sense that this be part of the abuse of authority definition as it might evidence an effort to conceal misconduct.

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**          **Page 8 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

8 of 19

To the extent that petitioners insist that this new definition breaks with prior practice, the fact is that body cameras are relatively new. Plus, CCRB is permitted to change a prior practice where it "has set forth a rational basis for changing its approach" (*id*. at 561). Considering that the CCRB investigates complaints and a video of the encounter is very helpful evidence, it is rational that the CCRB should be able to recommend discipline to the police commissioner for improper use of body cameras.

**Disposition Changes**

Petitioners also challenge other aspects of the rule changes. They claim that the new disposition categories are arbitrary and capricious. Petitioners claim that for almost three decades, CCRB has used various disposition categories when resolving cases. They observe that CCRB used "unsubstantiated" to signify that there was "insufficient evidence" and "exonerated" to mean that "there was preponderance of the evidence that the acts alleged occurred but did not constitute misconduct." Petitioners stress that other dispositions were used where CCRB was not able to fully investigate that cited the specific reason, such as "Complainant Unavailable."

Petitioners complain that CCRB has now changed these case dispositions as follows: "Unsubstantiated" to "Unable to Determine," "Exonerated" to "Within NYPD Guidelines," while sweeping all of the shortened investigations into a single "Unable to Investigate" disposition. They argue that these dispositions are critically important for officers and the public. Petitioners point out that CCRB publishes case dispositions publicly and they demand that they be fair and accurate representations. They urge the Court to dismiss CCRB's explanations that these updated dispositions are easier for the public to understand or improve public transparency.

150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL          Page 9 of 19
vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL
Motion No.  001 002

[* 9]

9 of 19

Petitioners argue that the term unsubstantiated derives from CCRB's charter and that there is no basis to change it now.  They question why CCRB would want to modify these terms so that CCRB will use different terminology than the terms used by the NYPD and other investigative agencies in New York City. Petitioners argue that it is especially irrational because CCRB does not have final disciplinary authority (NYPD retains the final say). Petitioners contend that these changes will cause mass confusion as the records for a complaint will differ depending on whether it is a CCRB file or an NYPD file.

CCRB argues that these changes reflect its effort to use plain English terms instead of legalese. With respect to the change from "exonerated" to "within NYPD guidelines," CCRB insists that the new term is clearer and more accurate.  It emphasizes that this is a situation in which the acts happened and so the term exonerated might raise a question about whether the acts happened at all.  CCRB argues that the new phrase makes it clear that the actions of the officer were within the guidelines.

CCRB argues that the change from "unsubstantiated" to "unable to determine" is a straightforward change to a more readily understandable term. It points out that the term unsubstantiated could suggest that the incident did not occur at all, that it did occur but not as alleged, that the officer did not engage in the alleged misconduct or that the evidence was insufficient.  CCRB argues that using unable to determine makes clear that CCRB simply could not reach a determination and does not connote the extent to which the officer engaged in the misconduct.

CCRB insists that sweeping a variety of case dispositions into a catch-all called "unable to investigate" makes these outcomes more intuitive to the public.  It argues that this is within its

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL     Page 10 of 19
vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL
Motion No.  001 002**

10 of 19

authority to make this sort of change and that records are available if someone wanted to discover the reason for why CCRB was unable to investigate the claim.

The Court finds that the changes to the dispositions of exonerated and unsubstantiated are supported by a rational basis. CCRB rationally explained that the term exonerated might encompass outcomes not typically associated with the word exonerated (i.e., that the allegations did not occur at all as opposed to the actions falling withing the NYPD guidelines). The memo in support of this change notes that "Within NYPD Guidelines is the new term for exonerated cases where there was a preponderance of the evidence that the acts alleged occurred but did not constitute misconduct" (NYSCEF Doc. No. 5). The common understanding of exonerated is certainly broader than what CCRB hopes to connote with this disposition. In other words, CCRB wants to use a disposition category that says the acts alleged happened but were not misconduct and exonerated could improperly suggest the acts didn't happen at all.

Similarly, using unable to determine is rational because it is much easier for the public to understand this disposition instead of unsubstantiated. These are situations in which there was not sufficient evidence to establish whether there was an act of misconduct. CCRB need not be beholden to anachronistic terms like unsubstantiated simply because it is in the charter.

The fact is that the standard by which this Court must consider these changes is whether it had a rational basis (*Lynch*, 206 AD3d at 560). It is not whether this Court "likes" these changes or if the Court would have continued using the prior terms.

However, the Court finds it irrational to use the "unable to investigate" label instead of describing the reason. The previous terms used phrases as "Complainant Unavailable," "Alleged Victim Unavailable," "Complainant Uncooperative," "Alleged Victim Uncooperative," and "Alleged Victim Unidentified." The Court finds that CCRB did not properly justify this change.

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**                    **Page 11 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

[* 11]

11 of 19

These dispositions provide concise and informative justifications for the outcome. Removing these terms will, as CCRB readily admits, require someone to look into the records to discover the reason CCRB was unable to investigate. That explanation does not constitute a rational justification. Any rational reader looking at an "unable to investigate" disposition will inevitably question *why* CCRB wasn't able to investigate. And the old disposition categories provided that explanation right away.

**Severe Act of Bias**

The NY City Charter was recently amended to provide for investigations of "past professional conduct by members of the police department." These new charter provisions include a directive that the CCRB "shall define what constitutes a severe act of bias and, in consultation with each covered entity, what constitutes a covered entity's final determination that such a member engaged in an act of bias or severe act of bias, provided that off-duty conduct may be the basis for initiating such investigation only if (i) such conduct could have resulted in removal or discipline by the police department, (ii) the board reasonably believes such conduct has had or could have had a disruptive effect on the mission of the police department, and (iii) the police department's interest in preventing actual or potential disruption outweighs the member's speech interest" (NY City Charter, § 441[b][2]).

Petitioners challenge CCRB's severe act of bias definition, which is the new statutory threshold for a mandatory past professional conduct investigation. They claim the definition is so overbroad that it reads the term "severe" out of the charter and it is arbitrary and capricious. They insist that it deprives officers of any predictability regarding such complaints.

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL
vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL
Motion No.  001 002**

**Page 12 of 19**

12 of 19

Petitioners argue that CCRB's definition does not properly incorporate the word "severe" and did not properly create a sliding scale of conduct. They point out that the charter permitted (but did not require) investigations into acts of bias other than those considered to be severe. Petitioners insist that the definition drafted by CCRB does not reflect the higher threshold for the conduct the charter revisions were intended to capture.

CCRB insists that the charter gave it broad discretion to define what constitutes a severe act of bias as opposed to an act of bias (which is expressly defined in the charter). It observes that this distinction only applies to whether or not CCRB is required to investigate past conduct and that CCRB always has the discretion to investigate past conduct. CCRB stresses that its definition must only be more serious than a plain "act of bias" and its definition meets that requirement. It also takes issue with petitioners' focus on physical harm and observes that acts can be severe even if they include only psychological or economic harm.

The Court observes that the term "act of bias" is defined in the charter and provides that "The term "act of bias" means an act stemming from a specific incident: (i) that is motivated by or based on animus against any person on the basis of race, ethnicity, religion, gender, sexual orientation or disability" (NY City Charter § 441[a][i]). And CCRB's definition of severe act of bias is: "'[S]evere act of bias'" is an act of bias by a member of the Police Department that (i) causes death, physical injury, or serious psychological or economic injury to the victim(s) of the act, (ii) subjects the victim(s) of the act to demeaning, degrading, or humiliating treatment, or (iii) involves criminal conduct, sexual misconduct, threat of violence, or conduct that otherwise shocks the conscience" (NYSCEF Doc. No. 11 at 4).

The Court denies the request to strike this definition as irrational. CCRB correctly points out that, at least when compared with the definition of "act of bias," the definition of severe act

of bias regulates conduct that is much more substantial. It attempts to capture conduct that is more "severe" than conduct considered to be a mere "act" of bias.

The Court rejects petitioners' argument that this definition is overbroad or too vague. The very nature of this type of definition is inherently reliant on the facts and circumstances of each particular case; CCRB need not limit this definition simply because there is a wide range of actions that can fall under common notions of what is severe.

Petitioners' insistence that psychological or economic injury should not be included is also not a basis to reject this rule. There is no question that psychological and economic injuries can have substantial impact on a victim and nothing in the charter suggests it was supposed to be limited to only physical injuries.

The phrase "demeaning, degrading or humiliating" is also rational as it captures conduct that is demonstrably worse than an act that is merely motivated by bias (the definition for act of bias). And, similarly, CCRB was rational to include sexual misconduct. The power dynamic present during an encounter between an officer "while on the job" and a civilian suggests that nearly all such sexual misconduct committed by the officer towards the civilian is coercive. That justifies its inclusion in the definition of severe act of bias.

And, finally, including a "shocks the conscience" phrase was also rational. This term is often used in legal settings and the Court sees no reason why its inclusion here is irrational (*e.g., Chavis v City of New York,* 94 AD3d 440, 443 [1st Dept 2012] [applying the shock the conscience standard while evaluating whether alleged police misconduct violated substantive due process]).

At a broader level, there is no doubt that crafting such a definition is inevitably difficult. Undoubtedly, every stakeholder or interested party will not be fully satisfied. Providing too

150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL          Page 14 of 19
vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL
Motion No.  001 002

14 of 19

much detail might inevitably raise questions about why certain conduct was omitted or complaints that it is too verbose while too little detail invites questions about vagueness and the scope of the definition. In other words, CCRB was given the unenviable task of creating such a definition—its effort here is rational and supported by reasonable justifications. That petitioners have objections is understandable but those disagreements, standing alone, are not a basis to strike this definition.

**Final Determination**

Petitioners object that CCRB violated the charter's requirement that it define and publish what constitutes a final determination under § 441 (the section about past misconduct). They observe that a final determination triggers CCRB's ability to conduct a past professional conduct investigation. Petitioners observe that the NY City Charter § 441[b][2] required CCRB, "in consultation with each covered entity" to "define . . . what constitutes a covered entity's final determination that such a member engaged in an act of bias or severe act of bias."

They argue that CCRB merely parroted this language and did not come up with an actual definition and demands that until it comes up with such a definition, it be enjoined from commencing any investigations.

The Court grants this relief. CCRB offers a lengthy discussion about what constitutes a rule and whether that is required here. But it also includes a footnote that it "does not dispute that it may not commence a § 441 investigation until it defines what constitutes a "final determination" for the "covered entity" that made the finding that might trigger such an investigation" (NYSCEF Doc. No. 35, n18). That appears to be relief that petitioners seek with

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**          **Page 15 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

[* 15]

15 of 19

respect to this portion of their petition—that CCRB not commence any 441 investigations until it comes up with a definition for final determination.

**Delegation**

The final issue raised in the petition concerns delegation. Petitioners argue that Rule 1-14 violates the charter by improperly allowing the CCRB to delegate its power to initiate complaints. This rule provides that "The Board may delegate its power to initiate complaints to the Civilian Complaint Review Board's Chair, Executive Director, General Counsel, or Board member panel, subject to any conditions deemed appropriate by the Board. The authority delegated to the Chair, Executive Director, General Counsel, or Board member panel to initiate complaints may be revoked by the Board" (NYSCEF Doc. No. 37 at 3).

Petitioners insist that CCRB cannot delegate the power to initiate a complaint unless the relevant legislative body has authorized it to do so. They point out that when a legislative mandate includes a specific delegation authority, CCRB cannot go beyond that provision. Petitioners contend that the charter restricts CCRB's delegation authority in two instances: [1] issuing subpoenas and initiating proceedings to enforce them and [ii] past professional conduct investigations. They insist that these acts are delegated only to the Executive Director or Chair. Petitioners argue that the existence of specific delegation clauses demonstrates the absence of a general delegation authority.

CCRB argues that when the city council passed Local Law 24 in 2022 (which amended the section in the charter about CCRB), its express purpose was to allow CCRB to be proactive and not wait for weeks or months for a board meeting to initiate an investigation. It argues that the wording of this local law supports the notion that CCRB was entitled to make this delegation.

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**          **Page 16 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

16 of 19

CCRB includes a quotation from a New York City Council hearing in which a council member notes that "Currently, the CCRB only has authority to conduct an investigation in response to complaints filed by a member of the public. This longstanding policy, however, unfairly places the burden on the victims of officer wrong-doing and can lead to long delays for these investigations. Members of the public often do not file complaints to the CCRB for a variety of reasons, including fear of retaliation or just not knowing where to begin. Introduc[ing] 2440 will change this by allowing the agency to be proactive and not have to wait before they take action. As the nation's largest civilian oversight agency, the CCRB has the important responsibility of looking into and issuing findings for bad behavior…. Enhancing their authority will lead to greater accountability when it comes to public safety" (NYSCEF Doc. No. 35, n19).

The Court denies the branch of the petition that seeks to strike this rule. The recent passage of Local Law 24 of 2022 added language to the charter so that it now reads "The board is authorized, within appropriations available therefor, to appoint such employees as are necessary to exercise its powers, *including but not limited to the power to initiate complaints in accordance with paragraph 1 of this subdivision*, and fulfill its duties. The board shall employ civilian investigators to investigate all matters within its jurisdiction" (NY City Charter § 440[c][5] [new items italicized]). A plain reading of this provision suggests that CCRB has the power to appoint employees to initiate complaints. Therefore, CCRB's rule is not an improper delegation.

## Summary

The Court emphasizes that any contentious rulemaking such as the one at issue here will inevitably generate opinions both for and against the changes (*see* NYSCEF Doc. Nos. 43-53

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL Motion No.  001 002**

**Page 17 of 19**

17 of 19

[comments on the rule changes]).  This Court's role is not to assess whether it agrees or disagrees with these rule changes.  Instead, the Court's role is only to consider whether CCRB's actions were rational. As the Appellate Division, First Department observed, petitioners seeking to strike CCRB's rule changes have a "'heavy burden' of showing the revised rules to be so lacking in reason that [they were] essentially arbitrary" (*Lynch*, 206 AD3d at 560).

Except for the "unable to investigate" disposition and the lack of a definition for a final determination, the other portions of the recent rulemaking are anything but arbitrary.  The record in this proceeding shows that CCRB's actions came after deliberate study (the body camera issue), a thoughtful intention about using plain-English terms (the dispositions), and in reaction to recent changes in the charter (which required it to come up with definition).  These were not haphazard or slipshod efforts devoid of justification.  And while the objections raised by petitioners are well taken, this Court's role is not to micromanage every CCRB action.  In fact, CCRB is granted deference in these matters and petitioners' disagreement with CCRB's rules is not a basis for this Court's intervention in every instance.

Accordingly, it is hereby

ADJUDGED that the petition is granted only to the extent that the rule concerning unable to investigate Rule 1-33(e)(6) is stricken and to the extent petitioners seek to bar respondents from commencing NY City Charter § 441 investigations until respondents have generated a definition for final determination and it is denied with respect to the remaining relief requested, without costs or disbursements to any party; and it is further

DECLARED that respondents may not commence a past professional conduct investigation under NY City Charter § 441 until it defines what constitutes a final determination in accordance with this section of the charter and it is further

**150441/2023   POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

**Page 18 of 19**

18 of 19

DECLARED that Rule 1-33(e)(6) is stricken and the prior disposition categories are reinstated ("Complainant Unavailable," "Alleged Victim Unavailable," "Complainant Uncooperative," "Alleged Victim Uncooperative," and "Alleged Victim Unidentified"); and it is further

ORDERED that the motion (MS002) by the New York Civil Liberties Union for leave to submit an amicus curiae is granted without opposition.

| 1/2/2024 | | | ARLENE P. BLUTH, J.S.C. | |
|---|---|---|---|---|
| **DATE** | | | | |

| CHECK ONE: | X | CASE DISPOSED | | NON-FINAL DISPOSITION | |
|---|---|---|---|---|---|
| | | GRANTED | DENIED X | GRANTED IN PART | OTHER |
| APPLICATION: | | SETTLE ORDER | | SUBMIT ORDER | |
| CHECK IF APPROPRIATE: | | INCLUDES TRANSFER/REASSIGN | | FIDUCIARY APPOINTMENT | REFERENCE |

**150441/2023  POLICE BENEVOLENT ASSOCIATION OF THE CITY OF NEW YORK, INC. ET AL**   **Page 19 of 19**
**vs. NEW YORK CITY CIVILIAN COMPLAINT REVIEW BOARD ET AL**
**Motion No.  001 002**

19 of 19